**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| AARON M. SMEIGH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:09-cv-0414-TWP-DML |
| | ) |
| JOHNS MANVILLE, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant's Motion for Summary Judgment. Specifically, this dispute centers around Defendant Johns Manville Inc.'s decision to fire Aaron Smeigh four days after he was injured on the job. Immediately after his injury, Mr. Smeigh indicated that he might fail the drug screening that was going to be administered at the hospital. This concern, however, never came to fruition: Mr. Smeigh's drug test came back clean. Nevertheless, based on his statement, Johns Manville, Inc. demanded that Mr. Smeigh sign a Stipulation of Understanding requiring, among other things, counseling and drug testing. After Mr. Smeigh refused, he was terminated. Mr. Smeigh now brings the present action, alleging that: (1) his termination was unlawful because it was in retaliation for his decision to exercise his statutorily conferred right to file a workers' compensation claim; and (2) Johns Manville, Inc. unlawfully converted his personal property following his termination. For the reasons set forth below, Defendant's Motion for Summary judgment [Dkt. 37] is GRANTED in its entirety.

## I. BACKGROUND

On June 6, 1994, Aaron Smeigh ("Smeigh" or "Plaintiff") started working for Johns Manville, Inc. ("JM" or "Defendant") as a general operator, and later rose to the position of hot end operator. Throughout his employment with JM, Smeigh belonged to a union, UAW Local 1073, intermittently serving as a union steward. By all accounts, Smeigh was an excellent, reliable, and tireless worker. He was considered knowledgeable, had a spotless employment record, and sought out as much overtime work as possible – regularly working 50 to 60 hours a week.

On Saturday, September 20, 2008, midway through second shift around 7 p.m., Smeigh severed the tip of his right index finger while moving a fiberizer cart. Smeigh immediately applied gauze to the wound and walked to the JM parking lot to wait for a ride to the hospital. There, he was met by his direct supervisor Bill Seamans ("Seamans"), who stayed with Smeigh until an ambulance arrived. JM enforced a policy that required workers injured on the job to submit to drug testing. After being asked by Seamans if he could pass a drug test, Smeigh expressed concerns that his test could come back positive or inconclusive. According to Smeigh, the week before, he entered a room where marijuana had just been smoked. Smeigh feared that his secondhand inhalation of marijuana smoke could register on a drug screen. Soon thereafter, Matt Weber ("Weber"), acting plant manager at the time of the injury, arrived on scene. Seamans explained to Weber the nature of the injury and mentioned Smeigh's comment regarding the drug test. Soon thereafter, Weber joined Smeigh at the hospital.

The evening of the accident, Seamans drafted an electronic document memorializing the nature of Smeigh's injury and his alleged admission regarding the drug test. According to this document, Smeigh stated to Seamans, "Bill, I'm sorry but you must know that I will not pass a piss

2

test. I want you to know that before the results come back." When Seamans asked him to clarify, Smeigh admitted, "I'm dirty, I won't pass the urine exam."

Weber arrived at the hospital and met Smeigh in the emergency room. Smeigh's wife Stephanie joined them shortly thereafter. Weber and the Smeighs have vastly different recollections of the conversations that night. According to the Smeighs, the conversation was benign, centered around a football game showing on the hospital television. Conversely, Weber describes a more candid encounter. Weber's notes – created the day after the incident – state that Smeigh was visibly upset by the prospect of losing his job due to the drug test and admitted smoking a "big one" at a picnic over Labor Day weekend. According to Weber's notes, Stephanie Smeigh also lamented the fact that marijuana was illegal, since "people like Aaron" do not enjoy drinking alcohol. Smeigh and his wife vehemently deny that this conversation occurred. Smeigh, in fact, believes he worked on Labor Day, stating, "I worked every day, so I'm almost positive that I worked Labor Day that year." This Court must view all facts in the light most favorable to Smeigh, therefore this Court will accept as fact Mr. Smeigh's allegations regarding the hospital conversations. One important fact from that night is not in dispute: the results of Smeigh's drug test came back negative.

On Monday, September 22, 2008, Smeigh underwent surgery on his finger. In the meantime, Weber contacted JM's Divisional Human Resources Manager Gail Threet ("Threet") to ascertain if Smeigh's purported admission constituted a violation of JM' s Substance Abuse Policy ("Policy"). In relevant part, the Policy in force at the time of the accident states:

> Violation of this policy will result in disciplinary measures against the offender and may result in termination of employment . . . If an employee voluntarily comes forward and identifies a substance abuse problem prior to an investigation commenced by the company, employee assistance will be provided on a one-time basis with no impact on job status. Involuntary referrals to an employee assistance program may also be made by a manager.

3

After speaking with Weber and reviewing the timeline of events, Threet concluded that Smeigh's statement constituted an involuntary admission and that he had violated JM's Policy. However, instead of terminating Smeigh's employment, Threet and Weber opted to offer Smeigh a Stipulation of Understanding ("Stipulation"). Threet prepared the first draft of the Stipulation, and, subsequently, JM management met with union representatives to discuss, and ultimately modify, the Stipulation. The key requirements of the Stipulation presented to Smeigh were as follows:

- Smeigh was required to meet with an employee assistance program counselor and sign certain forms and complete counseling recommendations;

- Smeigh was required to submit to 8 random drug and alcohol tests within 12 months of returning to work, including one hair test, with any positive results leading to termination; and

- Smeigh was required to pay for certain expenses, including those associated with drug testing.

On Wednesday, September 24, 2008, Smeigh traveled to the JM plant and attended a meeting with both JM management and union representatives. At this meeting, he was presented with the Stipulation. By this time, Smeigh knew that if he did not sign the Stipulation, his employment with JM would be terminated. Nevertheless, Smeigh refused to sign, citing his belief that proper protocol was not being followed, particularly in light of the negative drug test results and his otherwise flawless work record. More specifically, Smeigh strenuously opposed paying for drug testing expenses, contending that this provision of the Stipulation was illegal. In light of Smeigh's refusal to sign, Weber terminated Smeigh's employment with JM.

Bernice Wilson ("Wilson"), the union's recording secretary, informed Smeigh that his lockers would be cleaned out with a union official and a company official present, and then his property would be returned. No one from JM's management mentioned Smeigh's property at this

4

time. Nor did Smeigh raise the issue because he believed he would get his job back: "I assumed that I would be getting my job back after the grievance process, after it went to arbitration." Ultimately, Smeigh's locker was cleaned out, and, according to Smeigh, Wilson took possession of his property. Initially, Wilson sent some of his personal property home, but not his tools. When Smeigh inquired about his tools, Wilson informed him that they were still in her office because she needed to look through them. Roughly a week later, Wilson told Smeigh that his tools had been stolen out of her office and that she would have to replace them.

On September 25, 2008, JM mailed Smeigh's official termination letter, citing Smeigh's refusal to sign the Stipulation as his reason for termination. Ultimately, the union grieved on Smeigh's behalf, but his claim was never actually arbitrated. Instead, in February 2009, the union and JM management reached a compromise allowing Smeigh to return to work if he signed a reinstatement agreement ("Reinstatement Agreement"). The Reinstatement Agreement was similar to the Stipulation, but contained less onerous terms: (1) Smeigh would now be subject to a maximum of four random hair tests over the next two years; (2) JM agreed to pay all costs associated with the drug tests; and (3) if Smeigh's initial drug screen came back negative, JM would reinstate Smeigh with full seniority, but without backpay. The union encouraged Smeigh to sign; the international union representative believed the Reinstatement Agreement was the best deal he could get Smeigh. Once again, however, Smeigh drew a line in the sand and refused. According to Smeigh, JM "had no grounds" to require him to sign the Reinstatement Agreement and he did not want to blemish his work record.

JM has never broached the topic of workers' compensation with Smeigh. JM filed for workers' compensation on Smeigh's behalf and the only workers' compensation-related documents that Smeigh has seen were records of JM's payment of his benefits.

## **II. LEGAL STANDARD**

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth [v. Quotesmith. Com](v. Quotesmith. Com), Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubts as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

**III. DISCUSSION**

Smeigh has asserted two legal claims against JM: (1) that his termination was in retaliation for the exercise of his statutorily conferred right to file a workers' compensation claim; and (2) conversion. Each claim is discussed separately below.

*A.    Retaliatory Discharge*

Under Indiana law, generally, "employers may terminate employees for no cause whatsoever or for any cause at all without incurring liability." *Mack v. Great Dane Trailers*, 308 F.3d 776, 784 (7th Cir. 2002) (citations and internal quotations omitted). However, the Indiana Supreme Court carved out an exception to this general rule in *Frampton v. Cent. Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973), making it unlawful to discharge an employee in retaliation for filing a claim for workers' compensation. *Id.* at 428. Specifically, *Frampton* held that a viable cause of action exists "when an employee is discharged *solely* for exercising a statutorily conferred right." *Id.* (emphasis added). Contrary to Plaintiff's contention,[1] the Indiana Court of Appeals has explained that "use of the word 'solely' in *Frampton* is meant only to convey that any and all reasons for discharge must be unlawful in order to sustain a claim for retaliatory discharge." *Markley Enters, Inc.* v. *Grover*, 716 N.E.2d 559, 566 (Ind. Ct. App. 1999) (citation omitted).

"To survive summary judgment on a *Frampton* claim, the plaintiff must present evidence that would support a finding that the discharge was caused by his filing for benefits." *Mack*, 308 F.3d

---

[1] In his Opposition Brief, Plaintiff mistakenly states that "use of the word 'solely' by the *Frampton* Court does not mean that any and all reasons for the discharge must be unlawful in order to sustain the retaliatory discharge claim." [Dkt. 48 at 8].

at 784 (citation omitted). To do so, the plaintiff must establish a causal connection between his termination and the filing through either direct or indirect evidence. *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 785 (7th Cir. 2005) (citation omitted). But direct evidence – such as an outright admission – is a rare commodity; even the most heedless employer is unlikely to offer it up on a silver platter. Accordingly, most plaintiffs, including Smeigh, must rely on indirect evidence to establish a causal connection. Typical examples of indirect evidence include: (1) proximity in time between the filing of the claim and the termination; and (2) evidence that the employer's asserted lawful reason for the discharge is pretext. *Hudson*, 412 F.3d at 785 (citing *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1262 (Ind. Ct. App. 2002)). Both examples of indirect evidence are at issue in the case at bar.

### 1. Temporal Proximity

Generally, "Causation may not be inferred merely from evidence that (1) the employee filed for benefits and (2) was fired." *Mack*, 308 F.3d at 784 (citation omitted). "Depending on the circumstances, however, causation may be inferred from the rapidity and proximity in time between the employee's filing for benefits and the discharge." *Id.* All else equal, the shorter the lapse in time, the less additional evidence is needed to cast doubt on the employer's stated reasons for the discharge. For instance, Indiana courts have held that even a six-month gap between the filing for benefits and the discharge will not be fatal to a retaliatory discharge claim if additional evidence of retaliatory intent is offered. *Markley Enters., Inc.*, 716 N.E.2d at 565 (citing *Pepkowski v. Life of Indiana Ins. Co.*, 535 N.E.2d 1164, 1168 (Ind. 1989)); *see also Dale J.G. Bowers, Inc.*, 709 N.E.2d 366, 370 (Ind. Ct. App. 1999) (denying summary judgment where plaintiff was discharged just two days after returning to work from a three-week doctor mandated absence, and just one day after

receiving an impairment rating).

Smeigh relies almost entirely on timing evidence to establish causation. And for obvious reasons: he was, after all, terminated only four days after his injury. Stripped of its factual context, this short lapse between injury and discharge could be forceful evidence cutting in Smeigh's favor. However, when viewed in light of the entire factual record, the strength of this evidence dissipates considerably.

Indisputably, Smeigh was injured, and JM filed for workers' compensation benefits on his behalf. While waiting for the ambulance, Smeigh made a comment to his supervisor that raised the specter of a positive drug test. Based on this statement, JM prepared a Stipulation of Understanding, which Smeigh was required to sign and abide by in order to retain his job. Smeigh refused and he was terminated immediately.

Smeigh's temporal proximity argument ignores the reality that the same chain of underlying events led to both his termination and his workers' compensation benefits. Stated differently, there was an intervening cause (i.e. the statement and the refusal to sign the Stipulation) for his termination. Even drawing all reasonable inferences squarely in Smeigh's favor, these facts reduce the strength of Smeigh's timing evidence to "a wash." *Hudson*, 412 F.3d at 786-87 (granting summary judgment and recognizing that temporal proximity evidence was "a wash" where the same incident led to both the termination and the workers' compensation claim); *see also Crye v. Caterpillar, Inc.*, 4:07-cv-35-AS-APR, 2008 WL 5111349, at *7 (N.D. Ind. Dec. 3, 2008) (granting summary judgment where employee was unable to establish causal connection due to intervening event of being captured on video taking lengthy breaks); *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 594 (7th Cir. 2008) (granting summary judgment where employee was unable to establish

causal connection due to intervening event of unexcused absences).

Given its context, Smeigh's timing evidence falls flat. By itself, this evidence is insufficient to establish the requisite causal connection for purposes of summary judgment. As the Seventh Circuit has recognized, temporal proximity "is rarely sufficient in and of itself to create a jury issue on causation." *Hudson*, 412 F.3d at 787; *see also Tolbert v. Con-Way Transp. Servs., Inc.*, No. 4:04-cv-0082-DFH-WGH, 2005 WL 1476298, at *4 (S.D. Ind. June 15, 2005) ("Temporal proximity of discharge and notice of a claim may be sufficient, *with additional evidence*, to raise a genuine issue as to the reason for his discharge.") (emphasis added). Further, the need for additional evidence is especially acute where, as here, there is an intervening cause for the discharge. Smeigh's purported additional evidence (i.e. pretext evidence) is discussed immediately below.

### 2 Pretext

Causation may also be inferred from evidence of pretext, that is, "evidence that the employer's proffered reason for the discharge is 'patently inconsistent with the evidence before the court.'" *Mack*, 308 F. 3d at 784 (quoting *Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind. Ct. App. 1999)). "Pretext means a dishonest explanation, a lie rather than an oddity or an error."*O 'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and internal quotations omitted). For pretext determinations, the Court's only concern "is the honesty of the employer's explanation." *Id*. at 984 (citation and internal quotations omitted). Here, the Court must analyze whether or not JM's proffered explanation is a lie to cover up unlawful retaliation.

Unquestionably, JM proffered a legitimate, lawful reason for discharging Smeigh: his refusal to sign the Stipulation. On this point, the law is well-settled: an employer may terminate an employee for violations of valid work rules. *Hudson*, 412 F.3d at 786. This is true even if the

Stipulation was ill-considered, mistaken, or even "medieval." *See, e.g., O'Regan*, 246 F.3d at 984 (granting summary judgment and determining that pretext was not shown even though employment agreement – the basis of plaintiff's argument – may have been "unnecessary, ineffective, and unenforceable."). In an attempt to discredit JM's explanation, Smeigh relies on a single allegation: that JM did not follow its own internal substance abuse policies and procedures with respect to discipline. Certainly, an employer's departure from its own policies and procedures may create a genuine issue of material fact as to pretext. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005).

That said, Smeigh's argument is simply inconsistent with the factual record; the evidence indicates that JM acted well within the parameters of its own Policy. As discussed above, JM's Policy states as follows:

> Violation of this policy will result in disciplinary measures against the offender and may result in termination of employment . . . If an employee <u>voluntarily comes forward and identifies a substance abuse problem prior to an investigation commenced</u> by the company, <u>employee assistance will be provided</u> on a one-time basis with <u>no impact on job status.</u> Involuntary referrals to an employee assistance program may also be made by a manager. (emphasis added).[2]

Presupposing that his statement was voluntary, which is highly questionable, Smeigh argues that JM flouted its own Policy by terminating his employment rather than offering him employee assistance. [Dkt. 48 at 12] ("Weber ultimately terminated Plaintiff's employment versus offering

---

[2] Plaintiff insists that JM had three different substance abuse policies in place at the time of Smeigh's injury. [Dkt. 48 at 12]. Even if true, which is highly questionable given the meager evidentiary basis for two of the policies [*See* Dkt. 50 at 6-9], this fact is of no import. First, JM offered Smeigh employee assistance, thus complying with all of the policies. Second, none of the three policies supports Smeigh's contention that his statement was *voluntary*. One policy states that a voluntary statement is one made "prior to a request for testing." [Dkt. 48-5 at 5]. The other policies, the one excerpted above and one dated July 1998, describe a voluntary statement as one made prior to a company investigation. [Dkt. 48-3 at 2]. Smeigh's statement was made after the drug test became inevitable. By any of the policies' standards, this fact likely extinguishes the voluntariness of his statement.

Plaintiff any form of employee assistance."). This contention is belied by the Stipulation, which allowed Smeigh to retain his job if, among other things, he met with an employee assistance program counselor and signed appropriate release and information forms. It is difficult to imagine how meeting with an employee assistance counselor does not constitute "employee assistance." On top of this, there is no evidence available to suggest that these conditions would have adversely affected Smeigh's "job status." Presumably, his completion of the Stipulation's demands would have placed him in the same position that he occupied prior to the incident.

Moreover, pursuant to its own policy, JM was only required to offer employee assistance if "an employee voluntarily comes forward." Contrary to Smeigh's contentions, the voluntariness of his statement is questionable, given the fact that Smeigh did not make a statement until *he knew a drug test was inevitable*. In fact, JM, through Threet, reached the opposite conclusion – determining that Smeigh's statement was involuntary. In light of the context of his statement, this determination is eminently reasonable. At bottom, whether the statement was voluntary, involuntary, or some indefinable hybrid, JM followed its own Policy when discharging Smeigh.

In his deposition testimony, Smeigh testified that "in the 14 and three-quarters years that I had worked [at JM], I had never seen an employee treated like this over an accident." But he offered no comparative evidence to support this – or to suggest that the Policy had been enforced in an inconsistent or arbitrary fashion. Given the dearth of comparative evidence, coupled with timing evidence that is no more than "a wash," no genuine issues of material fact exist. *See Mack*, 308 F.3d at 785 (granting employer's motion for summary judgment and observing that because there was no evidence that employer's practice was unusual or inconsistent with policy, no inference of retaliatory intent existed); *Purdy v. Wright Tree Serv., Inc.*, 835 N.E.2d 209, 214 (Ind. Ct. App. 2005) (granting

12

summary judgment for employer even after employee proffered some comparative evidence, observing that minor inconsistencies in employer's enforcement of policy do not create genuine issues of material fact for purposes of pretext).

The Court's conclusion is further reinforced by Smeigh's own deposition testimony. At one point, Smeigh agreed that he was terminated because "I refused to sign the stipulation and understanding, yes, that's an accurate reason why I was fired." Later, Smeigh was asked point-blank why he was terminated. Given the nature of his present allegations, his response is potentially telling:

> Q. As you sit here today, Mr. Smeigh, in your opinion, in your heart of hearts, why do you think you were terminated from Johns Manville?
>
> A. Because I was injured on the job and had a lost-time accident. And the equipment that I was injured on was immediately shut down for the next 12 hours, both lines. So they had 24 hours worth of downtime where they moved the drives over that I got hurt on, which to me states that they were negligent on the installation of the drives and were trying to cover their butts.
>
> Q. Cover their butts from whom?
>
> A. From OSHA.

Depositions require extemporaneous speaking, which often begets confusion or verbal fumbling. Nevertheless, these statements strengthen the Court's view that this case has very little to do with workers' compensation benefits.

In the end, JM's discharge of Smeigh may have been clumsy, myopic, or excessively harsh. However, the evidence does not suggest it was unlawful. Moreover, the Court cannot probe the merits of an employer's decision or adjudicate the wisdom of that decision: "[W]e do not take on the role of a super-personnel department that reexamines an entity's business decisions; rather, our inquiry is limited to whether the employer gave an honest explanation for its decision." *Purdy*, 835 N.E.2d

at 214 (citation and internal quotations omitted). Drawing all reasonable inferences in favor of Smeigh, the Court still cannot find that JM's explanation "is a lie to cover-up for retaliation," or that "the employment action [was] so patently inconsistent with the evidence that it suggests that retaliation was afoot." *Crye*, 2008 WL 5111349, at *7. To the contrary, the record supports JM's explanation. With no meaningful pretext evidence and unpersuasive timing evidence, Smeigh cannot point to any genuine issues of material fact. In accordance with *Frampton,* no reasonable jury could find that Smeigh was fired *solely* in retaliation for filing a workers' compensation claim. On this count, summary judgment is warranted.

### B      Conversion

Pursuant to Indiana statute, "A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion." *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind. Ct. App. 2008) (citing Ind. Code § 35-43-4-3). Moreover, "A person who has suffered a pecuniary loss as a result of a criminal conversion may bring a civil action to recover the loss." *Id.* (citation omitted). The same elements apply to both criminal and civil conversion; only the burden of proof differs. *Id*. Thus, even in a civil action, "criminal intent is an essential element that must be proven." *Id*. (citation omitted). Generally, to prove conversion, a plaintiff must show that: (1) the defendant's control over the property was unauthorized; and (2) the defendant was aware of a high probability that the control was unauthorized. *Manzon v. Stant Corp.*, 138 F. Supp. 2d 1110, 1115 (S.D. Ind. 2001) (citations and internal quotations omitted).

On this count, the factual record is relatively scant. After Smeigh's termination, Wilson, the union recording secretary, informed Smeigh that the union and the company would clean out his

lockers, separate his personal property from the property issued by JM, and then return his personal property to him. Smeigh's deposition testimony suggests that this protocol was customary. It is undisputed that Smeigh never engaged in any discussions regarding his property with JM's management, primarily because he assumed that he would return to his job after the union grievance process. Eventually, Smeigh contacted Wilson about the status of his property. Wilson informed him that she had already sent a few items home, but needed to "go through" the tools, presumably to segregate company property from personal property. About a week after this conversation, Wilson informed Smeigh that his tools had been stolen out of her office and that she would have to replace them. Since then, Smeigh has not spoken to Wilson or anyone else at JM about his tools.

Smeigh relies entirely on a single argument to bolster his conversion claim: that JM continued to possess his tools after he was fired "in spite of repeated requests from Plaintiff that Defendant [return his property]." [Dkt. 48 at 13]. In other words, Smeigh contends that JM repeatedly ignored or rebuffed his demands. This argument is at odds with the facts. Significantly, nothing in the record suggests that Smeigh even demanded his tools. Although demand is not an element of criminal conversion, it is evidence of intent. *Lambert Enterprises, Inc. v. Yellowbird, Inc.,* (1986), Ind.App., 496 N.E.2d 406, 409-4 10. Where the initial possession is lawful, conversion occurs after either an unqualified demand for return is made, *Coffel v. Perry* (1983), Ind.App., 452 N.E.2d 1066, 1069, or some other act is performed which puts the possessor on notice that his control is no longer authorized. Wilson took possession of Smeigh's tools in accord with workplace protocol. In his deposition, Smeigh only stated, "I had inquired about my tools with Bernice Wilson . . . [and] [t]hen about a week later, she informed me that some of my tools had been stolen out of her office." Moreover, Smeigh did not broach the subject of his tools with JM "because I assumed that I would

15

be getting my job back after the grievance process." Plaintiff's contentions notwithstanding, the record is devoid of evidence that Smeigh made repeated demands for JM to return his tools.

Smeigh has no evidence of JM's criminal intent. *See French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1167 (Ind. Ct. App. 2008) (plaintiff must present evidence of defendant's "criminal intent" to survive summary judgment). By Smeigh's own admission, he did not question JM management about the return of his personal property or otherwise notify JM management that his personal property remained at JM; also, there is no evidence suggesting that JM management ever possessed or exerted control over his personal property.

Finally, JM devoted considerable attention to the doctrine of respondeat superior in its opening brief, arguing that Smeigh cannot establish that one of its employees exerted unauthorized control over his property while acting within the scope of employment. In its response, Smeigh ignored this argument. Based on this failure to respond, the Court infers Smeigh's acquiescence, which operates as a waiver for this particular conversion-related argument. *See, e.g., Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001). After all, it is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

Given the barren factual record, the Court cannot speculate and manufacture a narrative that will allow Plaintiff to survive summary judgment.

Without a vicarious liability hook or evidence to establish criminal intent, Smeigh's conversion claim fails. The law on this point is well-settled: "an action for conversion may not be maintained against a person for losing the personal property of another, whether through negligence or by theft of the property from the defendant." 18 AM. JUR. 2D. *Conversion* § 48; *see also Eagle*

*Mach. Co. v. American Dist. Tel. Co.*, 140 N.E.2d 756, 760 (Ind. Ct. App. 1957) (plaintiff could not establish prima facie case for conversion against defendant, even though defendant's employees stole merchandise from plaintiff; observing that conversion by a bailee requires some "affirmative wrongful act"). For these reasons, summary judgment on Smeigh's conversion count is also warranted.

## IV. CONCLUSION

For the reasons noted herein, the Court GRANTS Defendant's Motion for Summary Judgment [Dkt. 37] in its entirety. A separate judgment shall issue in favor of Defendant.

SO ORDERED.

Dated: 09/22/2010

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

**Richard D. Hailey**
RAMEY & HAILEY
rich@rameyandhaileylaw.com

**Jane Ann Himsel**
LITTLER MENDELSON jhimsel@littler.com

**Brian Lee Mosby**
LITTLER MENDELSON, P.C.
bmosby@littler.com

**Joel Samuel Paul**
RAMEY & HAILEY lawjoel@hotmail.com